# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**PUBLIC EMPLOYEES FOR** )
**ENVIRONMENTAL RESPONSIBILITY** )
)
    **Plaintiff,** )
)
    **v.** )  **Civil Action No. 10-1274 (ESH)**
)
**U.S. DEPARTMENT OF THE** )
**INTERIOR,** *et al.*, )
)
    **Defendants,** )
)
)
**SAFARI CLUB INTERNATIONAL;** )
**NATIONAL RIFLE ASSOCIATION** )
**OF AMERICA,** )
)
    **Defendant-Intervenors.** )
_____)

## MEMORANDUM OPINION

Plaintiff Public Employees for Environmental Responsibility ("PEER") has sued the United States Department of the Interior, Secretary of the Interior Kenneth Salazar, the United States National Park Service ("NPS"), and NPS Director Jonathan Jarvis (collectively "defendants"), claiming violation of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act of 1969 ("NEPA"). 42 U.S.C. §§ 4321-4370(e). PEER challenges the denial of its petition for special regulations restricting hunting in the Mojave National Preserve and NPS's failure to supplement the environmental impact statement with an assessment of the denial's impact on the threatened desert tortoise population. Pending before the Court are plaintiff's and defendants' cross-motions for summary judgment. Also pending is a motion for summary judgment filed by defendant-intervenors Safari Club International and National Rifle Association of America (collectively "intervenors"). For the

reasons stated herein, this Court grants defendants' motion for summary judgment and denies the motions filed by intervenors and plaintiff.

## BACKGROUND

The desert tortoise, *Gopherus agassizzi*, is a large, herbivorous reptile found in the Mojave and Sonoran deserts of southern California and other areas of the southwestern United States.  (AR3 at 27.[1])  In general, desert tortoises inhabit rocky terrain and slopes, as well as flats and bajadas, and spend most of their lives in burrows or caves, emerging to feed and mate in the late winter and early spring and remaining active through the spring and summer.  (AR1 at 8, 32.)

Since the 1970s, the dwindling population of the desert tortoise has evoked increasing concern.  (*Id.* at 16.)  The species' "catastrophic" decline has been attributed to various factors including predation by humans and wildlife, habitat destruction, disease, and fragmentation which results from urbanization, agricultural development, grazing, mining, and roadways.  (*Id.* at 8, 21.)  Recovery is slow because desert tortoises do not reach sexual maturity until 13-20 years of age, have low reproductive rates even when they reach reproductive potential (AR2 at 24), and experience high pre-productive adult mortality rates—approximately 98%.  (AR1 at 41 (explaining that "desert tortoise populations are not capable of rapid growth" even when survivorship rates are normal).)

In 1990, after administrative advocacy by environmental groups, the United States Fish and Wildlife Service ("FWS") listed the desert tortoise as "threatened" under the Endangered

---

[1] The administrative record will be referenced as "AR."  The AR is comprised of three sets of documents.  The number immediately after "AR" refers to the document set number.  The final number in this citation format is the page number within the document set.  For example, "AR1 at 3" refers to the third page in the first document set in the administrative record.

Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531-1544. [2]  (AR1 at 385.)  In February 1994, the

FWS designated critical habitat[3] for the Mojave population, which is a regulatory definition for

desert tortoises in the regions north and west of the Colorado River.  (AR1 at 385.)  In June 1994,

as required by the ESA, the FWS published a recovery plan[4] ("1994 Recovery Plan") that

analyzed the causes for the decline and set forth a long-term plan for eventually delisting the

desert tortoise.  (*Id*. at 23.)  The 1994 Recovery Plan identified numerous reasons for the decline

in desert tortoise populations (*id*. at 17-24), and recommended various actions to aid in recovery.

(*Id.* at 70-77.)  It identified the "discharge of firearms, except for in the context of hunting big

game or upland game birds from September through February," as one of the activities that

"should be prohibited through [selected areas within the desert tortoises' range] because [it is]

generally incompatible with desert tortoise recovery."  (*Id*. at 71-72.)

The Mojave National Preserve ("Preserve"), located in southern California, is a 1.6-

million acre unit of the National Park System that was established in 1994 by the California

Desert Protection Act ("CDPA"), 16 U.S.C. §§ 410aaa-42.  (AR1 at 467-68.)  As part of the

National Park System, the Preserve must be managed in accordance with the preservation

---

[2] A "threatened species" is one that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id*. § 1532(6).

[3] "Critical habitat" is a specific, legally defined area that is "essential for the conservation of the species and [] which may require special management considerations or protection."  16 U.S.C. § 1532(5).

[4] A "recovery plan" is a document developed and implemented by the FWS to provide for the conservation and survival of all endangered and threatened species.  16 U.S.C. § 1533(f).  Such a plan incorporates, to the maximum extent practicable, site-specific management actions that may be necessary to achieve the plan's goal for the conservation and survival of the species, and an estimate of the time required and cost to carry out those actions as well as intermediate steps toward the goal.  *Id*.

mission as provided in the Organic Act of 1916.  16 U.S.C. § 1.  Given this mission, hunting is

not ordinarily permitted in National Park System units.  (AR1 at 430.)  This prohibition,

however, is subject to certain congressionally-authorized exceptions (*see* AR1 at 430, 536), such

as the CDPA, which expressly allows hunting in the Preserve.  16 U.S.C. §§ 410aaa-46. When

hunting is authorized in a National Park System unit, NPS must, under the NPS Management

Policies, publish special regulations to govern hunting unless a formal waiver is issued.[5]  NPS,

Management Policies 2006 at 103 (Policy 8.2.2.6), *available at*

http://nps.gov/policy/mp2006.pdf.

NPS is required to develop a general management plan to govern the Preserve.  (AR1 at

546.)  This process is governed by the NPS Management Policies and must accord with NEPA.

(*Id*. at 433.)  In addition, since about half of the Preserve is designated as critical habitat for the

threatened desert tortoise (*id*. at 467-68), nearly all actions taken in the Preserve must comply

with ESA procedures.[6]  (*See id*. at 434.)  Effectively, this means that NPS must consult with the

---

[5] Because the NPS Management Policies provide only internal agency guidance, they are generally unenforceable in court.  *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 595-97 (D.C. Cir. 2006).

[6] The ESA provides various protections to threatened or endangered species and designated critical habitat.  Of relevance here, federally backed actions that "may affect" such species or critical habitat  require consultation under Section 7 of the ESA.  *See* 50 C.F.R. § 402.14(a). When triggered, Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).  Formal consultation culminates in a Biological Opinion ("BO") from the FWS which determines whether the agency action would jeopardize the species or adversely modify its habitat.  *Id*. § 1536(b).  A BO is a written statement prepared by the FWS which details how the agency action affects an endangered or threatened species or its critical habitat.  The BO includes a conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat.  50 C.F.R. § 402.14. "If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives" to avoid the jeopardy or adverse modification.  *Id*. § 1536(b)(3)(A).

FWS about actions that may affect a threatened or endangered species (*id.* at 434), and assess the impact of any significant proposed action by creating an Environment Impact Statement ("EIS").

On September 5, 1995, NPS published in the Federal Register a Notice of Intent to create the General Management Plan ("GMP") to govern the Mojave National Park.  (*Id.* at 545.) Between 1995 and 1997, NPS elicited public input by holding twenty scoping[7] meetings, convening workshops attended by a total of approximately 250 people, publishing five newsletters, and creating a website.  (*Id.* at 553-57.)  As required under the ESA, NPS requested a BO from the FWS regarding the impact of the proposed action (the creation of the GMP) on threatened or endangered species in the Preserve.  (*Id.* at 356.)

In 1998, NPS published a draft version of the GMP and accompanying EIS ("Draft EIS/GMP").  (*Id.* at 545.)  Following publication of the 1998 Draft EIS/GMP, NPS held eleven public meetings, attended numerous meetings of the Mojave Advisory Council, and received approximately 390 comment letters from various individuals after soliciting feedback in the Federal Register.  (*Id.*)  In addition, NPS received approximately 1,800 identical postcards from members of environmental groups.  (*Id.*)

"Due to the large number of substantial changes required as a result of public comments on the 1998 draft, [NPS] decided to rewrite the [draft GMP/EIS]." (*Id.*)   To reflect the changes to the EIS/GMP, NPS sought modifications to the BO and, in September 2000, released the Revised Draft EIS/GMP for a new round of public comment.  (*Id.*)  Following the September 2000 publication, NPS held eleven more public meetings and received 202 written comments.

---

[7] "Scoping" is a term of art in NEPA defined as the "process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  40 C.F.R. § 1501.7.

(*Id*.)  After taking into account this second round of input, NPS prepared an Abbreviated Final EIS/GMP intended to be integrated into the Revised Draft EIS/GMP.  (*Id*.)

On July 6, 2001, the FWS issued a BO for the GMP, which concluded that the "proposed action" (the GMP) was not likely to jeopardize the desert tortoise and was therefore in compliance with the ESA.  (*Id*. at 403.)  This version of the BO was based upon the GMP, which provided that "NPS will work with the California Department of Fish and Game [("CDFG")] to limit hunting in the Mojave National Park [ . . . which] would eliminate the discharge of firearms when desert tortoises are active in the spring."  (*Id*. at 362.)  On September 7, 2001, the Superintendent of the Preserve requested that the FWS amend the BO to allow for hunting of cottontail rabbits ("cottontails") and jackrabbits from September to January and, on September 19, 2001, the FWS modified the BO accordingly.  (*Id*. at 556.)

On September 21, 2001, the NPS Regional Director responsible for the Preserve signed the Record of Decision (ROD) for the Mojave Abbreviated Final EIS/GMP.  (*See id*. at 544-57.)  In the ROD, NPS explained that it had considered three alternatives with regard to restricting hunting.  (*Id*. at 546-53.)  With regard to hunting, Alternative 1 provided that NPS would pursue the promulgation of special hunting regulations that would allow for the hunting of big game and upland game birds, plus a limited season for cottontails and jackrabbits; Alternative 2, the "no-action" or status quo alternative, provided that then-existing state regulations would remain unchanged; and Alternative 3 allowed for hunting of game and non-game species permitted under state law from July through January.  (*Id*. at 547-50.)  NPS ultimately selected Alternative 1 (pursuing special hunting regulations) which was reflected in the final version of the GMP.  (*Id*. at 553, 556.)

In April 2002, NPS published the final EIS/GMP which outlined the proposed
management of the Preserve.  (Id. at 420-583.)  Consistent with the ROD, the GMP indicated
that NPS would seek special regulations under state law in consultation with the CFDG to
restrict hunting, allowing it only during the period of September to January or early February and
to limit hunting to only big game, some small game (cottontails and jackrabbits) and upland
game birds.  (*Id.* at 505.)

On June 20, 2002, PEER and other environmental groups submitted a petition
("Petition") to defendants asking that they promulgate the special hunting regulations as
described in the GMP.  (*See id.* at 590-614.)  Specifically, the Petition requested the following
regulations:

> (a) Hunting is allowed only for big game animals and upland game
> birds, as such species are defined by State regulations, during the
> seasons established by the State of California Department of Fish
> and Game.
>
> (b) In no case will any hunting be permitted from the period
> beginning on March 1 and ending on September 30 of each year.
>
> (c) The discharge of rifles is prohibited within one mile of the
> Hole-in-the-Wall Visitor Center, Mid-Hills campground, the
> Granite Mountains Natural Reserve, the Soda Springs Desert Study
> Center, the communities of Kelso and Cima, Kelso Dunes, and
> Piute Creek.

(AR1 at 592.)

On September 5, 2002, NPS formally requested that the CDFG promulgate the special
hunting regulations discussed in the GMP.  (*See id.* at 617-19.)  The CDFG declined to
promulgate regulations after finding them unwarranted, and ultimately, NPS agreed.  (AR3 at
152-153.)[8]

---

[8] The administrative record contains numerous exchanges between various environmental groups
and defendants regarding the requested regulations.  (*See, e.g.*, AR2 at 1-4, 10-15.)  It is not

In 2008, the FWS released the Draft Revised Recovery Plan for the Desert Tortoise ("2008 DRRP").  (AR2 at 16-242.)  The 2008 DRRP aimed to respond to a recommendation from the General Accounting Office ("GAO")[9] that that the Tortoise Management Oversight Group review the 1994 Recovery Plan to better link land management decisions with research. (*Id*. at 33 (explaining that, at the time the 1994 Recovery Plan was drafted, "much was unknown about the severity of specific threats to desert tortoises [ . . . and so] the recommendations were made without establishing priorities that would reflect the differences in seriousness of the threats").)  The 2008 DRRP identified a number of threats to the desert tortoise population; unlike the 1994 Recovery Plan, however, it did not recommend restricting hunting, but noted activities that "may impact the species includ[ing] non-motorized recreation such as camping, *hunting*, target shooting, rock collecting, hiking, horseback riding, biking, and sightseeing."  (*Id*. at 47 (emphasis added).)

On July 28, 2010, PEER filed suit, alleging unreasonable delay in responding to the Petition.  (*See* Compl.)  At that time, NPS had not responded to the Petition nor had it begun to promulgate the requested regulations.

On September 30, 2010, the FWS published the "Mojave Population of the Desert Tortoise (*Gopherus agassizii*) 5-Year Review: Summary and Evaluation" ("2010 5-Year Review").  (AR3 at 26-148.)  The 2010 5-Year Review concluded that "implementation of the

---

necessary to detail all of these letters, but it is worth nothing that as late as April 7, 2004, the Assistant Secretary for Fish and Wildlife and Parks indicated that "[t]he park fully intends to pursue promulgation of federal regulations."  (*Id*. at 14-15.)  The letter further stated that the content of the federal regulations would be dependent on the actions of the California Fish and Game Commission and that "[t]he promulgation of federal regulations with regard to species and seasons for hunting, therefore, is temporarily on hold in anticipation of a response from the State."  (*Id*.)

[9] *See generally* GAO, *Endangered Species: Research Strategy and Long-Term Monitoring Needed for the Mojave Desert Tortoise Recovery Program* (2002).

[2008 DRRP] will resolve key uncertainties about threats and management, thereby improving recovery potential." (*Id*. at 109.) Promulgation of hunting regulations was not included as one of the recommended actions for the next five years. (*Id*. at 110-12.)

On October 14, 2010, the same day that defendants filed their answer to the complaint, NPS denied the Petition. In its letter to PEER, NPS recognized its change of position—acknowledging that it previously indicated that it would seek special hunting regulations for the Preserve—and provided a detailed explanation as to why it ultimately decided that such regulations were not warranted. (*Id*. at 149-54.) Citing the 2008 DRRP and its own experience, NPS explained that it had no evidence that small game hunting had a negative impact on tortoises and that it had chosen to pursue other recommendations from the more recent recovery report. (*Id*.) It also explained that, although it did initially seek to cooperate with the CDFG per the GMP, the CDFG found such restrictions unwarranted and refused to change the state hunting rules; ultimately, it explained, NPS came to agree. (*Id*. at 152.) In its denial letter, NPS formally waived the NPS Management Policy (8.2.2.6) that required it to implement special hunting regulations where hunting was authorized. (*Id*. at 153.)

On December 12, 2010, PEER filed its amended complaint, asserting two claims: Claim I alleges that defendants' denial of the Petition was arbitrary and capricious, in violation of the APA, and Claim II alleges that defendants violated NEPA by making a significant change to the GMP without assessing the environmental impact. (*See* Am. Compl. ¶¶ 68-74.) Both PEER and defendants filed cross-motions for summary judgment. Intervenors, who were permitted to submit a brief on non-cumulative issues, filed a motion for summary judgment on the ground that PEER lacks standing to pursue its claims.

## ANALYSIS

### I.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In a case involving review of a final agency action under the APA however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *See Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. 01-0273, 2005 WL 691775 at *7 (D.D.C. Mar. 23, 2005). Under the APA, it is the agency's role to resolve factual issues and arrive at a decision that is supported by the administrative record, and "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769-70 (9th Cir. 1985); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record."). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), *cited in Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003).

Under the judicial review provisions of the APA, an administrative action may be set aside only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360,

375-76 & n.21 (1989).  While agency actions are presumed valid and granted substantial

deference, they are not spared a "thorough, probing, in-depth review." *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Marsh*, 490 U.S. at 378 (explaining

that review of administrative action "must be searching and careful" though "the ultimate

standard of review is a narrow one") (internal quotation marks and citation omitted).  Courts

must assure themselves that the agency has considered the relevant information and explained a

"rational connection between the facts found and the choice made." *Burlington Truck Lines v.*

*United States*, 371 U.S. 156, 168 (1962).  When "reviewing an agency's explanation, [courts]

must 'consider whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment.'" *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best*

*Freight Sys., Inc*., 419 U.S. 281, 285 (1974)).  "Under … this 'narrow' standard of review, [the

court must] insist that an agency 'examine the relevant data and articulate a satisfactory

explanation for its action.'" *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 129 S.Ct.

1800, 1810 (2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  It is "clear, however,

that a court is not to substitute its judgment for that of the agency," *id*. (internal quotation marks

omitted), and should "uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned." *Id.* at 1810 (quoting *Bowman Transp., Inc.*, 419 U.S. at 286).

## II.   STANDING

In support of its motion for summary judgment, PEER submitted declarations from two

PEER members which describe injuries forming the basis of PEER's claims.  (*See* Pl.'s Mot. for

Summ. J. ("Pl.'s Mot."), Exs.1, 2.)   In their motion for summary judgment, intervenors

challenge the individual members' standing and PEER's associational standing—its ability to

bring suit on behalf of these members. [10]   In response, PEER argues that the declarations are
sufficient and that it has satisfied the requirements for associational standing.  (Pl.'s Reply in
Supp. of its Mot. for Summ. J. & Opp'n to Defs.' Mots. for Summ. J. ("Pl.'s Opp'n") at 17-22.)

The standing requirement encompasses "both constitutional limitations on federal-court
jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498
(1975).  There are three minimum elements necessary to establish constitutional standing:

> (1) the plaintiff must have suffered injury in fact, an actual or
> imminent invasion of a legally protected, concrete and
> particularized interest; (2) there must be a causal connection
> between the alleged injury and the defendant's conduct at issue;
> and (3) it must be "likely," not "speculative," that the court can
> redress the injury.

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (quoting *Lujan v.
Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).  Here, PEER "bears the burden of
providing, by affidavit or other evidence, specific facts sufficient to demonstrate standing; once
provided, however, those facts will be taken as true by this Court."  *Town of Barnstable v.
F.A.A.*, 659 F.3d 28, 31 (D.C. Cir. 2011) (internal quotation marks and citations omitted).  "At
this stage, …[this Court] must assume the [plaintiff] will prevail on the merits," *id*., meaning that
this Court must assume that NPS would ultimately determine that special hunting regulations are
in fact necessary.

Intervenors argue that the declarations fail to meet all three of *Lujan*'s requirements: that
is, they do not adequately allege "injury in fact," do not allege injuries that were caused by the
acts which PEER challenges, and do not describe injuries that would be redressable by the relief

---

[10] In the letter denying the Petition, NPS noted that it did not "believe that [the petitioners] would
necessarily have Article III standing in federal court with respect to this matter."  (AR3 at 149.)
At that time, PEER's claim under the APA would have been different because PEER had not
previously received a response to the Petition, and therefore it had not challenged the substance
of the response.  In the instant suit, only the intervenors challenge PEER's standing.

for which PEER sues.  (*See generally* Ints.' Mot. for Summ. J. ("Ints.' Mot.") at 2-10.)  Further, intervenors argue that the declarants' interests do not justify prudential standing and that PEER does not meet the test for associational standing.  (*Id.* at 10-11.)  After considering each of intervenors' standing arguments, discussed in turn below, this Court finds that PEER has standing.

PEER, one of the original signatories to the Petition, is a member-based non-profit organization representing public employees who are charged with protecting America's environmental resources, some of whom reside in the Preserve.  (Am. Compl. ¶ 18.)  In support of its motion for summary judgment, PEER submitted declarations from two of its members: Howard Wilshire, a retired geologist who works and vacations in the Preserve (*see* Pl.'s Mot. Ex. 1 (Decl. of Howard Wilshire) ("Wilshire Decl.")), and Kevin Emmerich, who owns land in the Preserve and visits the Preserve frequently.  (*See id.* Ex. 2 (Decl. of Kevin Emmerich) ("Emmerich Decl.") ¶ 9.)

A.      **"Injury in Fact"**

In its amended complaint, PEER alleged that "its members are injured by the direct harm to endangered species, such as the desert tortoise, as well as other ecosystem damage caused by the absence of federal regulations governing hunting on the Mojave Preserve."  (Am. Comp. ¶ 19.)[11]  Specifically, Mr. Wilshire, a retired biologist, alleges that he worked and vacationed in the Preserve for years, many of his 150-plus publications relate directly to the Preserve, he has worked closely with biologists to protect the desert tortoise, and he has "witness[ed] the wanton destruction of the desert tortoise's habitat."  (Wilshire Decl. ¶¶ 3, 4, 6, 7.)  He also indicates that

---

[11] In the amended complaint, PEER also alleged harm to the organization.  (*Id.*)  However, PEER has since indicated that it does not seek standing as an organization and only makes claims on behalf of its members, including Wilshire and Emmerich.  (Pl.'s Opp'n at 17 n.9.)

he will continue to visit the Preserve "regularly and often so long as I am able" and specifically describes two upcoming trips.  (*Id.* ¶ 8.)[12]  He explains how his research interests are harmed by the threat to the desert tortoise (*id.* ¶ 11), and how his aesthetic enjoyment of the Preserve is diminished by the sound of gunshots, sight of shotgun shells, and damage to small trees from gunshots.  (*Id.* ¶¶ 9, 11 (describing such sights as "unsettling and disgusting").)

Mr. Emmerich, a former NPS Park Ranger and current PEER member, describes similar injuries.  (*See generally* Emmerich Decl.)  He has lived in the Mojave Desert for twenty years and has been visiting the Preserve since 1981.  (*Id.* ¶¶ 5, 7.)[13]  He has owned a 160-acre plot in the Preserve since 1992, continues to camp there "quite frequently," and describes an upcoming trip to the Preserve.  (*Id.* ¶¶ 9, 11.)  He explains how the presence of small game hunters has diminished his aesthetic enjoyment of the Preserve by leaving bullet shells (*id.* ¶ 12), "unsightly and ecologically damaging trash" and "off highway vehicle tracks" (*id.* ¶ 16), which "destroy[] habitat, can directly kill and impact desert tortoise, plants and wildlife and proliferate[] the spread of invasive plants."  (*Id.* ¶ 13.)  Further, he describes experiencing fear as a result of encounters with small game hunters.  (*Id.* ¶ 12.)

It is well-established that aesthetic damage can constitute "injury in fact."  *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972); *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 433-34 & n.6 (D.C. Cir. 1998) (en banc) (reaffirming *Humane Soc'y v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988)), which found "classic aesthetic" standing "based on a complaint 'that the

---

[12] Contrary to intervenors' contention (*see* Int.'s Supp. Br. on Standing at 2), the fact that Mr. Emmerich's and Mr. Wilshire's planned April 2011 trips are no longer "future plans" does not destroy plaintiff's standing.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183-84 (2000) (finding standing where affiants aver specific continuing use of the affected area).

[13] When he began visiting the area, it was under the jurisdiction of the Bureau of Land Management and was known as the Eastern Mojave National Scenic Area.  (*Id.* ¶ 7.)

existence of hunting on wildlife refuges forces Society members to witness animal corpses and environmental degradation, in addition to depleting the supply of animals and birds that refuge visitors seek to view'"). Intervenors argue that declarants lack "injury in fact" because they have not alleged harms specifically related to desert tortoises. (Ints.' Mot. at 5, 7.) However, this argument is unavailing because the detailed declarations satisfy "the key requirement" for aesthetic standing by demonstrating that Wilshire and Emmerich suffered injury in a "personal and individual way," *Animal Legal Def. Fund*, 154 F.3d at 433-34, as a result of defendants' failure to adopt special hunting regulations. (*See* Emmerich Decl. ¶¶ 13, 16, 17; Wilshire Decl. ¶¶ 11, 12. [14]) These declarations establish with specificity that two PEER members consistently visit the Preserve for work and pleasure and that the noise and visual effects of increased hunting in the March through September time period will impair their enjoyment and professional pursuits in that area. Thus, unlike plaintiffs who lack standing because they attest to using only "unspecified portions of an immense tract of territory," *Lujan*, 497 U.S. at 889, declarants here attested to their present and continued use of specific areas, including land owned by Mr. Emmerich. *See Friends of the Earth, Inc.*, 528 U.S. at 183-84 (finding standing where individuals alleged "reasonable concerns about the effects of [water pollutant] discharges, [which] directly affected those affiants' recreational, aesthetic, and economic interests"). Therefore, the aesthetic injuries alleged here satisfy the "injury in fact" requirement.

## B.    Causation

In their second challenge to standing, intervenors contest causation, arguing that plaintiffs' injury is not "fairly traceable" to defendants' conduct. (Ints.' Mot. at 6-9.) Causation

---

[14] Although intervenors argue that the declarants must plead injuries that are specifically tied to the desert tortoise (Ints.' Mot. at 5, 7), that is not the only type of harm that may result from an arbitrary and capricious refusal to restrict off-season hunting.

"demands a causal connection between the injury and the conduct complained of" or, in other words, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 83 (D.C. Cir. 2005) (internal quotation marks and citation omitted). "[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *Animal Legal Def. Fund, Inc.*, 154 F.3d at 440.

Intervenors contend that both declarations fail to demonstrate causation, arguing that there is no way to know that some of the harm—in particular the bullet shells and trash—is attributable specifically to small game hunters (as opposed to big game hunters). (Ints.' Mot. at 7-8.) They also point out that Mr. Emmerich's fear of small game hunters is caused by the hunters' hostile conduct and insist that this harm results from hunters' independent social conduct and not the lack of regulations. (*Id.*) At first blush, these arguments appear to have some merit. However, declarants have alleged injuries that result from an increased degree of hunting generally and have also alleged specific harms accruing to plants and wildlife as a result of improper off-season hunting. Therefore, at least some of their injuries are caused by the greater authorization of hunting in the Preserve. As PEER points out, the linkage of small game hunting and harm to desert tortoises in the 1994 Recovery Plan, the GMP, and the BO provides at least some indication of the likely causal relationship between the lack of hunting regulations and a negative impact on the tortoise. (Pl.'s Opp'n at 20.) The declarants make clear that the absence of the requested limitations on hunting allows the "activity [that] would allegedly have been illegal otherwise," *Animal Legal Def. Fund*, 154 F.3d at 441, and results in a great amount

16

of gunshots, bullet shells, trash, off-road driving, and disturbances to predator/prey relationships that decrease area wildlife and impair recovery of the desert tortoise population.  As such, the injuries alleged are sufficiently traceable to the defendants' failure to do what it "should have done" according to plaintiff's theory of the case.  *Id.*; s*ee also N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 83 (D.D.C. 2007) (challenged action need not be the "but-for cause" of the injury).

### C.      Redressability

Third, intervenors argue that declarants have not satisfied *Lujan*'s redressability requirement because they have failed to show that a favorable decision on the merits will ameliorate the harm alleged.  (Ints.' Mot. at 6-10.)  To do so, declarants are not required to "demonstrate with absolute certainty that the relief requested in their complaint will eliminate the harms they will allegedly suffer," but must show "only 'a substantial likelihood that the judicial relief requested will prevent or redress the[ir] claimed injury.'"  *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 82 (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc*., 438 U.S. 59, 79 (1978).  This Court must "assume for the purposes of standing that [plaintiff] will ultimately receive the relief sought." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (1996).[15]

---

[15] When parties claim standing based on violations of a procedural right, they "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7; *see also Wyo. Outdoor Council v. U.S. Forest Serv*., 165 F.3d 43, 51 (D.C. Cir. 1999) (indicating that in procedural rights cases the "necessary showing" supporting the "constitutional minima of injury-in-fact, causation, and redressability . . . is reduced"). Specifically, "so long as the procedures in question are designed to protect some threatened concrete interest of [the plaintiff's] that is the ultimate basis of his standing," *Lujan*, 504 U.S. at 573 n.8, the party invoking jurisdiction may establish injury in fact by "show[ing] that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of [that party]," *Fla. Audubon Soc'y*, 94 F.3d at 664.  Therefore, like the *Lujan* parties living alongside a proposed dam who were permitted to challenge errors in the construction licensing procedure, "even though [they could not] establish with any certainty that [adherence to the procedure] w[ould] cause the license to be withheld or altered," *Lujan*, 504 U.S. at 572 n.7, plaintiff here may challenge the procedures underlying the denial of the petition

Intervenors contend that neither declarant has established that the relief requested will redress their alleged injuries.  (Ints.' Mot. at 6-10.)  Pointing out that Mr. Wilson's planned Thanksgiving-time visit to the Preserve would occur when small game hunting would be permitted even under the requested regulations, intervenors contend that this would make it impossible for him to enjoy the "magnificent silence" he seeks.  (Ints.' Mot. at 7.)  However, because Mr. Wilson has alleged injury beyond simply the breach of the silence during a Thanksgiving visit, this argument is unavailing.  Interveners also attack both declarations as speculative, arguing that even if small game hunting were banned in the Preserve, there is no indication that Mr. Wilson would see more desert tortoises or fewer shotgun shells (*id*.), or that Mr. Emmerich would see more wildlife.  (*Id*. at 9.)  While it is true that plaintiff bears the burden of establishing that the requested relief is "'likely' as opposed to 'speculative,'"  (*id*. at 9 (citing *Sargeant v. Dixon*, 130 F.3d 1067, 1069 (D.C. Cir. 1997)), it is not difficult for this Court to find it likely that the existence of restrictions on small game hunting would mean less shotguns shells on the ground, less trash and refuse left by hunters, less gunshot noises, and less destroyed trees: this would reduce the aesthetic injuries about which declarants complain.  Moreover, assuming, as this Court must, that plaintiff would be successful on the merits, it is plausible that limiting hunting during the desert tortoises' active period would decrease the firing of shotguns, the number of carcasses that might attract predatory ravens, and off-road driving, thereby increasing declarants' ability to observe tortoises.

### D.    Prudential Standing

Although plaintiff has established constitutional standing, it must establish prudential standing as well, meaning that the "grievance must arguably fall within the zone of interests

---

even if it cannot prove that the outcome of a procedurally proper decision would yield the regulations it desires.

protected or regulated by the statutory provision[s]." *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Nuclear Energy Inst., Inc. v. E.P.A.*, 373 F.3d 1251, 1266 (D.C. Cir. 2004). And "on any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone-of-interests' for purposes of prudential standing." *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). "The zone of interest test, however, is intended to 'exclude only those whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).

Relying on *Role Models Am., Inc. v. Geren*, 514 F.3d 1308 (D.C. Cir. 2008), intervenors argue that "declarants' interests in seeing the Preserve 'hunter-free' are not even arguably within the zone of interests of any of the laws relevant to PEER's litigation," which "undermines PEER's ability to bring their action." (Ints.' Mot. at 6 n.4.) In *Role Models America*, however, the plaintiffs' claims were unrelated to the statute under which they sued. There, the plaintiff brought a claim under the Historic Preservation Act, but its organizational purpose was not to preserve historic sites; instead, it sought the property in order to use it as an educational facility for at-risk youth. *Id*. at 1311-12. Unlike the very different purposes there, the goals of plaintiff here are consistent with those of the statutes, since the ecological and aesthetic harms about which declarants complain are similar to the conservation and preservation goals of the CDPA, ESA, and NEPA. *See Mountain States Legal Found*., 92 F.3d at 1236 (finding plaintiff hikers' recreational interests within the zone of NEPA and explaining that protecting a threatened species is an interest within the zone of the ESA). Moreover, their claims regarding procedural

deficiencies in the decisionmaking process are within the zone of interests of the APA and NEPA. Declarants have therefore demonstrated prudential standing.

### E.     Associational Standing

In their final standing-challenge, intervenors argue that PEER may not sue on behalf of its members because it has not met any of the three requirements necessary for associational standing. (Ints.' Mot. at 11.)

In *Hunt v. Washington State Apple Advertising Commission*, the Supreme Court articulated the traditional test for associational standing, recognizing that

> an association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. 333, 343 (1977); *Am. Library Ass'n v. F.C.C.*, 401 F.3d 489, 492 (D.C. Cir. 2005).

Given this Court's finding that PEER's members have standing, PEER has met the first requirement. (*See supra* Section II(A)-(C).) As for the second requirement, PEER explained in the amended complaint that it is "a non-profit public interest organization….[that] serves the professional needs of the local, state, and federal employees—the scientists, hydrologists, biologists, and rangers— charged with the protection of America's environmental resources, including the resources within the National Park System and the Mojave Preserve in particular." (Am. Compl. ¶ 18.) Thus, the interests of Mr. Wilshire and Mr. Emmerich, who seek to protect and conserve the Preserve's environmental resources, are clearly germane to PEER's purpose. As for the third requirement, intervenors have not explained—and this Court finds no reason— why the participation of the individual members would be required in order for this Court to

adjudicate the claims asserted or grant the relief requested.  Therefore, PEER has satisfied the requirements for associational standing.

## III.     ADMINISTRATIVE PROCEDURE ACT

PEER contends that defendants' denial of the Petition for rulemaking was arbitrary and capricious in violation of the APA because defendants failed to provide an adequate explanation or supporting evidence for their decision.  (Pl.'s Mot. at 23.)  Central to PEER's argument is the fact that defendants' refusal to promulgate such regulations was a change from its previous commitment to do so, as stated in the EIS/GMP, which was based upon defendants' earlier evaluation of the facts.  (*Id*. at 26-33.)  PEER argues that, because defendants have changed their assessment without new evidence or data, they lack a reasoned basis for their decision and, to the extent that defendants have proffered reasons for denying the Petition, those reasons are "unsupported and unscientific."   (*Id*. at 27- 28.)  Defendants respond that they have supplied a reasoned response which is supported by the factual record and explains the change from the prior policy; thus, they claim, they have met their burden under the APA.  (Fed. Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 9-19.)  For the reasons explained herein, this Court agrees with defendants' position.

"'[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range' of levels of deference [a court] must give to agency action under [the] "arbitrary and capricious' [standard of] review."  *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (quoting *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987)).  Where "the proposed rule pertains to a matter of policy within the agency's expertise and discretion, the scope of review should 'perforce be a narrow one, limited to ensuring that the [agency] has adequately explained the facts and policy concerns it relied on and to satisfy ourselves that those facts have some basis in the record.'"  *WWHT, Inc. v. F.C.C.*, 656 F.2d 807, 817 (D.C. Cir. 1981)

(quoting *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979)).  In other

words, the Court must look to see whether the agency employed reasoned decisionmaking in

rejecting the Petition.  *Defenders of Wildlife*, 532 F.3d at 919.   The Supreme Court recently

clarified that the analysis is the same whether reviewing an agency's decision to depart from

prior policy or a decision in the first instance.  *Fox*, 129 S.Ct. at 1811 (explaining that the agency

"need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than

the reasons for the old one; it suffices that the new policy is permissible under the statute, that

there are good reasons for it, and that the agency *believes* it to be better."); *see also Air Transp.*

*Ass'n of Am., Inc., v. Nat'l Mediation Bd.*, No. 10-5253, 2011 U.S. App. LEXIS 24876, at *21

(D.C. Cir. Dec. 16, 2011) ("[F]or purposes of APA review, the fact that the new rule reflects a

change in policy matters not at all"); *Nat'l Cable & Telecomms. Ass'n v. F.C.C.*, 567 F.3d 659,

669 (D.C. Cir. 2009) ("[T]he existence of contrary agency precedent gives [a court] no more

power than usual to question the [agency's] substantive determinations.").

In its letter to PEER denying the Petition, NPS explained that the agency lacks evidence

that allowing non-game hunting negatively impacts tortoise mortality.  (AR3 at 149-154.)

Acknowledging that the 1994 Recovery Plan initially found that intentional shooting posed a

general threat to a broader geographic range of desert tortoises, NPS observed that even then, "it

[was] also recognized that this was less of an issue at the [P]reserve."  (*Id.* at 151.)  The letter

further explained that since then, "experience has not shown that shooting of tortoises during

active season is actually occurring in the [P]reserve" and that since it began monitoring desert

tortoise populations in 2001, "only one carcass has been discovered in the [P]reserve with a

bullet hole" and "it is not known whether the tortoise was shot and killed, or whether someone

shot at the shell."  (*Id.*)  Finally and importantly, NPS noted that the data from recent studies

"confirm [its] conclusion that restrictions on hunting in the [P]reserve are not needed to protect the tortoise from shooting or vandalism." (*Id.* (discussing the 2008 DRRP).)

In response to PEER's argument that non-game hunting increases the likelihood of uncollected carcasses that could attract ravens, NPS explained that it had no indication that this was an actual problem[16] and that, in any case, ravens typically reside in lower-elevation areas that do not serve as tortoise habitat. (*Id.*)

As for PEER's contention that hunting increases vehicular traffic, which increases the risk of crushing tortoises, the letter explained that NPS did not view this as a problem because there are so few hunters in the spring and summer seasons—only about thirty per month—and they are spread throughout an area that covers 1.6 million acres or 2,500 square miles. (AR3 at 151-52.) Moreover, "of these, most are coyote hunters who tend to hunt at night when tortoises are not active above ground." (*Id.* at 151) Although the 2008 DRRP indicates that there is a threat of crushing where traffic levels reach 220 to 5,000 vehicles per day, "total traffic levels on unpaved roads in the Preserve rarely if ever achieve these levels and very little of this traffic, particularly during the day, is attributable to hunters." (*Id.* at 152.) Accordingly, NPS concluded that it was "not reasonable to assume that this group contributes to tortoise mortality on unpaved

---

[16] NPS explained:

> [a]lthough the 2001 BO speculated about this possibility, it is not supported by current evidence. Appendix A of the [2008 DRRP] addresses threats to the desert tortoise and its habitat. Though it recognizes predator subsidies as a cause for increasing raven populations in the desert Southwest, these subsidies are most commonly road kill. Ravens fly along road corridors and easily find dead animals and also visit landfills and sewage ponds. Though non-game carcasses could potentially provide food for ravens, the carcasses are just as likely to be eaten by other predators like coyotes and foxes.

*Id.*

roads to any significant degree." (*Id*.)  While it is not entirely clear why the denial letter only discusses traffic levels on unpaved (versus paved) roads,[17] it nonetheless appears reasonable for NPS to conclude that the total additional traffic caused by thirty or so hunters per month (even if they were all small game hunters) would not justify promulgating special hunting regulations.[18]

Finally, NPS' denial explains that the agency has chosen to react to concerns identified in the Petition—and particularly those related to the threatened status of the desert tortoise—by implementing other recommended actions, including but not limited to, those that were set forth in the GMP.  (AR3 at 152-53.)  These include: prohibiting the collection of reptiles; banning target-shooting; establishing no-shooting zones around various campgrounds in response to public safety concerns; requiring that hunting dogs carry identification tags or be tattooed; pursuing possible desert tortoise augmentation (rearing juvenile tortoises) as discussed in the 2008 DRRP; and installing fencing (which the GMP indicated that NPS did not initially support, but a three-year study has since suggested is necessary).  (*Id*.)

In its motion for summary judgment, PEER argues that defendants must justify their departure from prior policy.  (Pl.'s Mot. at 26-33.)  To do so, PEER suggests that defendants must present new biological data to counter that which informed the prior policy.  (*Id.* at 26-27.) This is not entirely correct.  Although courts have at times required agencies to provide factual

---

[17] Although the BO does not distinguish between the mortality threat caused by vehicle use on paved versus unpaved roads (*see* AR1 at 396), it similarly focuses on paved roads when predicting that an indeterminable number of tortoises will continue to be killed on paved roads absent protective measures (*id.* at 396), and notes that "mortality is likely to be higher on paved roads than on unpaved roads." (*Id.* at 404.)  Another document in the administrative record reflects that in April of 2002, the reports that NPS was required to submit to the FWS reflected only one reported observation of a tortoise on a paved road in the Preserve.  (*Id*. at 585.)

[18] NPS reasonably explains that, if this were a problem, the preferred remedy would be driving restrictions and not hunting regulations.  (AR3 at 152 (referencing a recommendation in the 2008 DRRP, "which includes a recovery action titled 'restrict, designate, close, and fence roads' . . . but none with respect to hunting").)

support to justify their actions where the action appears to contravene the factual basis underlying the previous policies, *see, e.g.*, *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755-56 (D.C. Cir. 2009); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766-769 (9th Cir. 2007), the instant case is different.  In those cases, the agencies' prior decisions were based on evidence of harm to the protected species; here, by contrast, the research underlying the GMP and NPS' earlier pursuit of special hunting regulations can hardly be said to have provided a strong factual basis for concluding that permitting small game hunting would harm desert tortoises.  On the contrary, the 1994 Recovery Plan notes the scarcity of sound data regarding this threat.  (*See* AR1 at 20, 71, 99.)  The 2001 BO likewise lacks data in its discussion of harms that "could" occur from increased levels of human activity (*see id*. at 390-91), and describes the "actual level of mortality that would occur" from increased vehicles use as "difficult to predict." (*Id*. at 390.)

Subsequent studies in 2008 and 2010 similarly describe the lack of data confirming this potential threat.  (AR3 at 91 (2010 5-Year Study) (concluding that there is no data correlating recreational activities, including hunting, with impacts to desert tortoises, and instead noting that possible threats "may be inferred"); AR2 at 86 (2008 DRRP) ("[V]ery little is known about the[] demographic impacts [of individual threats] on tortoise populations or the relative contributions each threat makes to tortoise mortality . . . .  [and it is] difficult to tease apart relative impacts of individual threats (although some impacts, such as habitat loss, are fairly straightforward in that they eliminate populations completely)"); *id*. ("[M]eaningful threats-based recovery criteria cannot be identified at this time."); *id*. ("[W]e lack quantitative data on the specific contribution of raven predation, disease, or other individual threats on tortoise population declines"); AR2 at 47 (2008 DRRP) (discussing threats and stating that "other activities that *may* impact the species

include non-motorized recreation such as camping, hunting, target shooting, rock collecting, hiking, horseback riding, biking, and sightseeing") (emphasis added).)  In the past, as now, there has been little data showing that small game hunters pose an actual threat to desert tortoises—the only difference is that, at present, NPS has adopted a different policy judgment in response to this dearth of information.

PEER's second argument is that, to the extent that NPS has proffered evidence, the evidence is inadequate because the agency has not described the way in which it has monitored the Preserve to determine whether the shooting of tortoises is occurring.  (Pl.'s Mot. at 28.)  It argues that NPS is not entitled to rely exclusively on observations without demonstrating that these observations are systematic, comprehensive, or scientific.  (Pl.'s Opp'n at 5.)

As an initial matter, NPS' denial letter is clear that its denial of the Petition is based on more than anecdotes or its own observations; it also relies on the 2008 DRRP.[19]

The 2008 DRRP describes a systematic and scientific monitoring program and explains why this methodology improves upon that underlying the 1994 Recovery Plan on which PEER so heavily relies. (AR2 at 35-36.)  It explains that, by incorporating recent developments in surveying and technology, it seeks to more rigorously assess the threats to and recovery of the desert tortoise population than was possible in 1994.   (*Id.)*  In fact, the need to better link data and recovery actions was the impetus for the 2008 review of the earlier plan.  (*Id*. at 33-34 (explaining that, in response to the 2002 GAO recommendations, the FWS commissioned a study to review the 1994 Recovery Plan using scientific and analytical advances since 1994 and, in keeping with the findings of that study and the GAO recommendations, established the Desert

---

[19] In support of its argument, PEER offers, as an example of a more comprehensive survey, a study by Kristin Berry and Kevin Keith.  (Pl.'s Mot at 28 n.7.) It is noteworthy that Kristin Berry was part of the team that wrote the 2008 DRRP on which NPS relies. (*See* AR2 at 20.)

Tortoise Recovery Office (DTRO) to coordinate recovery planning and implementation, research, and monitoring, and recovery).) The 2008 DRRP explains that previous studies have been somewhat deficient because monitoring has focused on areas with high densities of tortoises and this method does not allow for surveillance of long-term trends within desert tortoise populations, habitat, or threats.  (*Id*. at 35.)  To improve this, researchers began conducting range-wide population monitoring using line distance transects in 2001.[20]  (*Id*. at 35-36.)  Although the information gathered through this method in the first few years was only sufficient to gain baseline information, it is expected to better detect long-term population trends over a wider range.  (*Id*. at 36; *see also* AR3 at 41 (2010 5-Year Report) (explaining that the FWS has implemented a range-wide survey using line-distance transects to gain the quantitative data on threats to tortoises that was not feasible to get from the previously-used long-term plot surveys).)[21]

Moreover, the 2008 DRRP details the methods by which it evaluated the relative threats posed to desert tortoises and prioritized recovery actions.  In Appendix C of the 2008 DRRP, the FWS describes in great detail the process by which the DTRO attempted to "identif[y] and prioritize[e] recovery actions that are most likely to ameliorate threats to tortoise populations at any geographic extent within the tortoise's range."  (*Id*. at 205.)  This "decision support system" draws upon land manager experience and existing publications and attempts to synthesize spatial threat data with degrees of threat, the relative contributions of mortality threats with

---

[20] Line-distance transect monitoring involved studying desert tortoises over a broader geographic range to get information about regional trends and population density.  (*Id*. at 35-36.)

[21] The previously-used plot surveys focused on long-terms study plots established in areas with high densities of tortoises.  (AR2 at 35.)  Information derived from these studies is considered to be limited to those specific areas and is not indicative of larger regional or range-wide trends.  (*Id*.)

demographic impact, the risks posed by single and aggregate risks, and the relative efficacy of various recovery actions.  (*Id.* at 207; *see also id*. at 110 (explaining that, in the absence of data on effects of individual threats, the recommendations are "based largely on information collected from workgroups convened during the recovery planning process or other sources, simple preliminary models, and the expert opinion of approximately 20 individuals from the tortoise science and management community.").

In addition, the monitoring mechanisms in place within NPS are such that the experience on which it relies is more than random reports as they may arise.  NPS is obligated to keep records of all injured or dead tortoises, to report all tortoise sightings (AR1 at 406), and to report any sighting of a dead or injured tortoise to the FWS within three days.  (*Id*. at 409.)  To fulfill these requirements, NPS has tortoise observation sheets that its employees—including rangers working in the Preserve—must complete when they encounter any tortoise, whether alive, injured, or dead.  (*Id*. at 584.)[22]  From these individual reports, NPS compiles an annual report to send to the FWS.  (*Id*. at 408.)  Although there may be more rigorous monitoring methods available, this Court must defer to the agency's chosen methodology so long as it bears a "rational relationship between the [method] and [that] to which it is applied."  *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 198 (D.D.C. 2008) (citing *Chem. Mfrs. Ass'n v. E.P.A.*, 28 F.3d 1259, 1265 (D.C. Cir. 1994)).  Moreover, an agency's choice of methodology, particularly regarding a scientific endeavor such as this, is a matter deserving of substantial deference.  *See Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*,  462

---

[22] In its April 4, 2002 FOIA request, PEER sought documents relating to tortoise injuries or death and the way that NPS employees report sightings of dead or injured tortoises.  (*Id*. at 414.) NPS indicated that it has a tortoise observation sheet to be used when an employee finds a tortoise that is alive, dead, or injured, but it has no records of tortoise mortality as a result of human-caused activities.  (*Id*. at 584.) Thus, the FOIA correspondence corroborates the reasonableness of NPS' conclusion that pursuing regulations is, at this time, unwarranted.

U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing

court must generally be at its most deferential.").  For these reasons, PEER's argument regarding

the "unscientific" nature of NPS' support for its decision is unpersuasive.

Finally, PEER argues that the absence of new information means that the same

conclusion regarding special hunting regulations should be reached.  (Pl.'s Mot. at 32.)  In its

briefing, it makes much of the fact that more recent studies—the 2008 DRRP and the 2010 5-

Year Report—"find[] that the same threats identified in the original listing rule (in 1990)

continue to affect the species today" and that "'little information since 1994 contradicts these

recommendations.'"  (*Id.* (quoting AR3 at 110).)  Therefore, in PEER's view, NPS must arrive at

the same conclusion.  *Id.*  The problem is that, in 1994, there was little evidence that small game

hunting was in fact a significant threat to tortoise mortality and, today, despite efforts to improve

monitoring and survey techniques (*see* AR2 at 35-36), there is still a paucity of data showing that

small game hunting impacts desert tortoises.  (*See id.* at 166 (2008 DRRP) (explaining that

"there are no data correlating these [non-motorized recreational] activities with impacts on the

desert tortoise" but that it "may be surmised based on information on visitor-use days that these

activities bring with them many of threats associated with increased human presence.") (relying

primarily on the 1994 Recovery Plan); *id.* ("Very few studies have been conducted to document

the effects of non-motorized activities to desert tortoises.").)[23]

---

[23]As noted as recently as 2008:

> despite clear demonstration that [the threats identified in the 1994
> Recovery Plan] impact individual tortoises, there are few data
> available to evaluate or quantify the effects of threats on desert
> tortoise populations. While current research results can lead to
> predictions about how local tortoise abundance should be affected
> by the presence of threats, quantitative estimates of the magnitude
> of these threats, or of their relative importance, have not yet been
> developed. Thus, a particular threat or subset of threats with

In the end, the decision to deny the Petition is supported by a reasoned response that explains NPS' conclusion based on the absence of evidence that small game hunting posed a threat to desert tortoises: this is particularly reasonable given the recent recommendations to protect desert tortoises through alternate means.  (*See* AR3 at 152 (denying the Petition and discussing other actions taken to further the goals of the GMP and desert tortoise recovery). NPS has thus "provided a reasoned analysis logically connected to the underlying facts in the record and its denial cannot be compared to the "two conclusory sentences" that were "insufficient to assure a reviewing court that the agency's refusal to act was the product of reasoned decisionmaking" in *American Horse Protection Association v. Lyng*.  812 F.2d at 6 (citing *Motor Vehicle Mfrs*. 463 U.S. at 52).  Accordingly, NPS' denial of the Petition is not arbitrary or capricious.

## IV.   NEPA

In its second claim, PEER argues that defendants have violated NEPA by making a substantive change to the proposed action (*i.e.*, deciding not to pursue special hunting regulations) without preparing a supplemental EIS ("SEIS") to assess the impact of this modification of the GMP.  (Am. Compl. ¶¶ 72-76; Pl.'s Mot. at 36-40.) [24]   In response,

---

discernable [sic] solutions that could be targeted to the exclusion of other threats has not been identified for the desert tortoise.

*Id*. at 23.

[24]  If an agency is not sure whether the action will create a significant environmental impact, NEPA sets forth procedures for an agency to determine whether an EIS is required.  *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503-04 (D.C. Cir. 2010) ("If it is unclear whether an action will 'significantly affect[] the quality of the human environment,' agencies may prepare an environmental assessment (EA).")   (internal citation omitted)). "Under the statute, agencies have the initial and primary responsibility to determine the extent of the impact and whether it is significant enough to warrant preparation of an EIS.  This is

defendants argue that an SEIS was not necessary because the change was too minimal to necessitate an SEIS and because the environmental impact of allowing hunting under state law (*i.e.* without additional special hunting regulations) was already considered in the initial EIS. (Defs.' Reply in Supp. of their Mot. for Summ. J. ("Defs.' Reply") at 14-16.) [25]

NEPA exists to ensure that federal agencies consider the environmental effects of proposed actions by requiring them to "carefully consider detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Under NEPA, a federal agency must prepare an EIS whenever a proposed government action qualifies as a "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340 (D.C. Cir. 2002) ("'If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken.'") (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)) (emphasis in *Peterson*). The EIS "shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies," 40 C.F.R. § 1502.2(d), discuss "[p]ossible conflicts between the proposed action and the objectives of Federal . . . land use plans, policies and controls for the area concerned," *id*. § 1502.16(c), and "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply

---

accomplished by preparing an EA …. If a finding of no significant impact is made after analyzing the EA, then preparation of an EIS is unnecessary." *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 126 (D.C. Cir. 1985). "If, after completing the EA, the agency finds that the proposed action would have no significant impact, it must prepare and file a [FONSI]." *Id*. at 126 n.3. In this case, however, defendants argue that the significance of the change was not in question and plaintiff has not suggested that either an EA or a FONSI was required.

[25] While defendants agree that "the GMP indicates that NPS intended to seek regulations," they nonetheless argue that the change to the GMP was not a significant one. (*Id*. at 14.)

defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14. "Such information may cause the agency to modify its proposed action." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).

Even after the preparation of the initial EIS, an agency must prepare a supplemental environmental impact statement (SEIS) if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see also Marsh*, 490 U.S. at 374. "'Not every change requires [a supplemental EIS]; only those changes that cause effects which are significantly different from those already studied require supplementary consideration.'" *Davis v. Latschar*, 83 F. Supp. 2d 1, 9 (D.D.C. 1998), *adopted and aff'd*, 202 F.3d 359 (D.C. Cir. 2000) (quoting *Corridor H Alternatives, Inc. v. Slater*, 982 F. Supp. 24, 30 (D.D.C. 1997)). Invoking 40 C.F.R. § 1502.9(c)(1)(i), PEER alleges that supplementation is required because NPS' determination is a "substantial change" to the GMP. (Am. Compl. ¶¶ 75, 76.) [26]

The agency has the "initial and primary responsibility to determine the extent of the impact and whether [that impact] is significant enough to warrant preparation of an EIS." *Sierra Club*, 753 F.2d at 126. When reviewing that decision, a court cannot "substitute [its] judgment

---

[26] Plaintiff alleged initially that an SEIS was also required under 40 C.F.R. § 1502.9(c)(1)(ii), which triggers the SEIS obligation when there are "significant new circumstances relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* However, the only "new circumstance" identified by plaintiff in its papers was the allegedly substantial change created by the Petition decision and the only time that plaintiff has referred to 40 C.F.R. § 1502.9(c)(1)(ii) was in its supplemental reply brief where it argued that *if* defendant claimed to rely upon new information, that might trigger the SEIS obligation. (Pl.'s Supp. Reply at 8.) However, as plaintiff acknowledges, defendants have not relied on significant new information (as opposed to reports confirming the lack of data that actual harm results from the hunting at issue here) (*see* Pl.'s Mot. at 30-31), so the Court need not discuss this prong of § 1502.9(c)(1).

for that of the agency as to the environmental consequences of its actions." *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1985) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976)), and its "more limited role is to ensure, primarily, that no arguably significant impacts have been ignored." *Pub. Citizen*, 848 F.2d at 267.  "Evaluating the 'impact' of those consequences on the 'quality of the human environment,' however, is 'left to the judgment of the agency.'" *Public Citizen*, 848 F.2d at 128 (citing *Sierra Club*, 753 F.2d at 267); *see also Davis*, 83 F. Supp. 2d at 9 ("Because the decision whether to prepare a supplemental EIS involves technical issues within the agency's area of expertise, courts generally 'defer to the informed discretion of the responsible federal agencies.'") (quoting *Marsh*, 490 U.S. at 377).  Thus, this Court's role is to determine if defendants took a "hard look" at the potential environmental concern and, if so, whether the agency's determination was arbitrary and capricious. *Chem. Weapons Working Group v. U.S. Dep't of Defense*, 655 F. Supp. 2d 18, 35 (D.D.C. 2009).

According to the parties, the difference in hunting permitted in the Preserve under the two different regimes (as set forth in the GMP and as exists after the Petition decision) is as follows:[27]

| Species | Permitted under state law | Permitted as described in GMP[28] | Difference[29] |
|---------|---------------------------|-----------------------------------|----------------|
|         |                           |                                   |                |

---

[27] (*See* Defs.'s Reply at 15; Pl.'s Supp. Reply at 6-7.)

[28] (*See* AR1 at 505 (GMP) ("In accordance with the [1994 Recovery Plan], hunting would be limited to upland game birds (mourning dove, quail, chukar), cottontails, jackrabbits, and big game (deer and bighorn sheep) during their designated [CDFG] seasons.  Cottontails and jackrabbits may be hunted only from September through January.").)

[29] This refers to the hunting permitted under state law that would not be permitted if the special hunting regulations described in the GMP were promulgated.

| | | | |
|---|---|---|---|
| Cottontail | July 1- last Sunday in Jan.[30] | Sept.-Jan. | July 1-Aug.10 |
| Jackrabbit | Year round[31] | Sept.-Jan. | Feb.1-Aug. 30 |
| Bobcat | Oct. 15- Feb. 28[32] | None | Oct. 15-Feb. 28 |
| Coyote, sparrows, starlings, weasels, skunks, opossums, moles, feral goats, rodents (except squirrels and listed species | Year round[33] | None | Year round |
| Gray fox | Nov. 24- last day in Feb.[34] | None | Nov. 24- last day in Feb. |
| Badgers | Nov. 16- last day in Feb.[35] | None | Nov. 16- last day in Feb. |
| Muskrat, mink | Nov. 16- Mar. 31[36] | None | Nov. 16- Mar. 31 |

Ultimately, however, whether a change is "substantial" so as to warrant an SEIS is determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes. *See, e.g, Airport Impact Relief, Inc. v. Wykle*, 192 F.3d

---

[30] Cal. Code Regs., tit. 14, § 308.

[31] *Id*. § 309.

[32] *Id*. § 478 (b).

[33] *Id*. § 472.

[34] *Id*. § 461.

[35] *Id*.

[36] *Id*. § 462.

197, 204 (1st Cir. 1999); *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505,

1509 (9th Cir. 1997).

As is clear from the Petition denial, defendants have concluded that this change will not

have a significant impact.  (AR3 149-154 ("[T]he evidence does not suggest that hunting at the

[P]reserve is harming the desert tortoise, nor that the requested regulations would help conserve

the tortoise."); *see also* Def.'s Reply at 14-16.)  The letter denying the Petition and the study it

incorporates by reference, which are described in detail above (*see supra* Section III) show that

defendants have taken the requisite "hard look" at the impact of declining to enact special

hunting regulations on the desert tortoise by considering evidence—spanning from 1994 through

at least 2008— and have provided a reasoned explanation for the agency's determination that the

declension to regulate will not have a significant environmental impact.[37]  In this letter, NPS

considered the threat posed by the shooting of tortoises, explained that it is not actually

happening in the Preserve, and concluded that further restrictions on hunting are not necessary.

(AR3 at 151.)  NPS also considered the possibility that increased hunting could increase the

number of vultures that might prey on young tortoises, but it found no current evidence to

support the prior speculation about this threat.  (*Id*.)  In addition, NPS evaluated the impact

created by increased vehicular traffic due to hunting during the tortoises' active mating season

and found that hunters' use of roads during this season was not sufficient to cause any detectable

impact on desert tortoise populations.  (*Id*. at 151-52.)  Having considered the evidence

generated through the initial EIS-creating process, post-GMP studies, and its own experience,

---

[37] To be clear, this Court finds that defendants' 2010 determination (*i.e.* that the refusal to promulgate special hunting regulations is not a substantial change that necessitates an SEIS because it will not create a significant environmental impact) is not arbitrary and capricious. Therefore, it is not opining on defendants' second argument, which is that, if this change were substantial enough to require an SEIS, the EIS/GMP created in 2002 would satisfy that obligation.

NPS agreed with the state biologists who had found it was not necessary to promulgate special hunting regulations.  (*Id*. at 152-53)

Plaintiff has not undermined defendants' determination that their decision would not have a significant impact. Although it suggests ways in which increased hunting permitted under the extant hunting regulations *could* impact the desert tortoise (*see, e.g*., Pl.'s Mot. at 31 (discussing deliberate killing and maiming); *id*. at 33 (discussing raven predation)), plaintiff's argument is based on speculation.  *See Davis*, 83 F. Supp. 2d at 9.  Much of plaintiff's challenge relies upon defendant's previous decision to seek such regulation which, plaintiff argues, shows that the environmental impacts were indeed significant.  (Pl.'s Supp. Reply at 4 (citing Pl.'s Mot. at 38-39).)  Citing to various sections of the initial GMP, PEER contends that its discussion of special hunting regulations proves that the recent decision will have a significant impact and thus constitutes a substantial change.  (*See* Pl.'s Mot. at 38-39.)  However, the portions cited do not demonstrate that NPS in fact found significant environmental impacts, as plaintiff contends (Pl.'s Supp. Reply at 5), but rather reflect defendants' policy judgment in response to inconclusive data.  (*See, e.g*., AR1 at 549-550, 552.)   PEER also points out that, when NPS sought to amend the GMP to allow certain hunting (of cottontail and jackrabbits from September to January), it formally requested that the FWS modify the BO to evaluate the impact of this change (Pl.'s Mot. at 40; *see* AR1 at 556), and argues that this shows that small changes to hunting regulations may significantly impact protected habitat or species.  (Pl.'s Opp'n at 40.)  While this Court does not dispute that small changes may create a significant impact, it has no basis to find that defendants have ignored such impacts in this case.  In the end, plaintiff has simply not demonstrated that the decision will "cause effects which are significantly different from those already studied," *Davis*, 83 F. Supp. at 10 (quoting *Corridor H Alternatives, Inc.*, 982 F. Supp. at 30).

Ultimately, the record shows that defendants have satisfied their burden; they have taken a "hard look" at the impact of not enacting the special hunting regulations and have made a determination, which is supported by the record, that this decision will not have a significant environmental impact. *Corridor H Alternative*s, *Inc*., 982 F. Supp. at 31 ("The record in this case demonstrates that defendants took such a hard look at the new alignment and determined that it imposed no significant effects beyond those studied in the expansive ASDEIS."); *see also Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1097 (10th Cir. 2004) (rejecting the argument that a decision to select a previously rejected alternative necessarily constituted  a "substantial change" and noting that "[e]ven assuming the [change] will have a significant environmental impact, the failure to issue a supplemental EIS is not arbitrary or capricious because the relevant environmental impacts have already been considered . . . . in the supplemental draft EIS and the final EIS."); *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 85-87 (D.D.C. 2000); *West Branch Valley Flood Prot. Assoc. v. Stone*, 820 F. Supp. 1, 8-9 (D.D.C. 1993).  Thus, "[w]hile plaintiff[] may disagree, [it] cannot show that defendants' decision was arbitrary or capricious; therefore, it is deserving of deference." *Corridor H Alternatives, Inc.*, 982 F. Supp. at 31.

Moreover, for this Court to reverse and remand defendants' decision would conflict with the governing "reasonableness standard," *Friends of River v. Fed. Energy Regulatory Comm.*, 720 F.2d 93, 109 (D.C. Cir. 1983), because it would require the agency to conduct an identical analysis on this question when it is clear that it has already looked closely at the environmental consequences of this decision. While this Court is mindful that review must be based upon the record, this rule requires "reversal and remand *only* where there is a significant chance that but for the error, the agency might have reached a different result." *N.L.R.B. v. Am. Geri-Care, Inc*.,

697 F.2d 56, 64 (2d Cir. 1982); *see also Envirocare of Utah, Inc. v. Nuclear Regulatory Comm.*, 194 F.3d 72, 79 (D.C. Cir. 1999) ("In the absence of such a possibility, affirmance entails neither an improper judicial invasion of the administrative province nor a dispensation of the agency from normal responsibility.'") (quoting Henry J. Friendly, *Chenery Revisited: Reflecting on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 211); *Am. Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 778 F.2d 850, 862 n.19 (D.C. Cir. 1985) (finding that "remand for further articulation would be futile since the outcome of that question follows automatically" and, therefore, "the best course is for the reviewing court to simply apply the obvious result"); *Beverly Health & Rehab. Servs. v. Thompson*, 223 F. Supp. 2d 73, 115 n.46 (D.D.C. 2002). Because reversal and remand here would be "an 'idle and useless formality,'" *Am. Geri-Care, Inc.*, 697 F.2d at 64 (quoting *N.L.R.B. v. Wyman*, 394 U.S. 759, 766 (1969)), this Court will not do so.

This Court finds that the agency did not violate NEPA, for it was not arbitrary and capricious for defendants to decide that declining to pursue special hunting regulations was not a substantial change that would necessitate an SEIS.

## CONCLUSION

For the foregoing reasons, the Court denies the motions for summary judgment filed by plaintiff and the intervenors and grants defendants' motion for summary judgment. A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 28, 2011